# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Antoinette Birth,                                    Civil No. 09-3386 (DWF/JSM)

        Plaintiff,

v.                                                   **MEMORANDUM**
                                                     **OPINION AND ORDER**

Joseph Cornelius Myles and
J.C. Penney Corporation, Inc.,

        Defendants.

_____

Lori C. Peterson, Esq., and Sheila K. K. Dokken, Esq., Lori Peterson & Associates, LLC, counsel for Plaintiff.

Thomas J. Conley, Esq., Law Office of Thomas J. Conley, counsel for Defendants.
_____


## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendants J.C. Penney Corporation, Inc. ("JCP"), and Joseph Myles (collectively, "Defendants").  For the reasons set forth below, the Court grants the motion in part and denies it in part.

## BACKGROUND

In October 2007, Plaintiff Antoinette Birth was hired to work in the jewelry department of a JCP store at the Southdale Mall in Edina, Minnesota.  (Birth Dep. at 45.)  At that time, Defendant Joseph Myles was Manager of the store's jewelry department.  (Myles Dep. at 32.)  The Store Manager was Michael Gleisburg.  (Gleisberg Dep. at 9.)

Birth asserts that Myles made inappropriate comments about her body and attire when she was at work. (Birth Dep. at 140-41.) For example, Birth asserts that Myles once told her "Your booty looks good in those pants." (*Id.* at 141.) At least one of Birth's co-workers also stated that Myles treated Birth differently from other employees. (Conley Dep. at 36.)

Birth alleges that Myles once instructed her to take a break so that he could talk with her. (Birth Dep. at 100.) Myles met with Birth in the mall outside the JCP store. (*Id.*) Birth claims that Myles admitted to hiring her because he was attracted to her and asked if Birth wanted to become romantically involved. (*Id.* at 95-96.) Birth was surprised by this, but she was afraid she would lose her job if she directly rejected his advances. (Birth Dep. Ex. 1 at 1.) Birth claims she attempted to discourage Myles by telling him she was engaged and by reminding Myles of his wife and family. (Birth Dep. at 96-97.) According to Birth, Myles continued to push the matter, stating that he would be leaving JCP in December and "had nothing to lose." (*Id.* at 97.)

Birth alleges that a few days after their meeting in the mall, Myles called her into his office. (*Id.* at 101.) Birth initially thought Myles wanted to discuss her attendance at work. (*Id.*) Instead, Birth alleges that Myles again asked her about starting a relationship. (*Id.* at 102.) When she refused and tried to leave, Birth asserts that Myles blocked her exit and told her that she "must have wanted something to happen" because she never explicitly told him "no." (*Id.* at 106.) Birth alleges that Myles tried to hug her but she pulled away. (*Id.* at 107.) She asserts that Myles pushed her up against the wall and put one hand on her chest and one hand on her arm, put his knee between her legs,

and rubbed against her groin.  (*Id.* at 98, 103, 150-51.)  She alleges that he demanded, "Just one kiss, just let me kiss you."  (*Id.* at 150-51.)  Birth began crying and Myles eventually let her leave his office to "fix [her] face."  (*Id.* at 108.)

On Birth's next scheduled day at work, a co-worker encouraged Birth to tell Patty Conley, the district loss prevention manager, about what happened with Myles.  (*Id.* at 126.)  Birth testified that she told Conley everything that had transpired in Myles's office.  (*Id.* at 127.)  Birth also met with Conley and Gleisberg, and she was eventually asked to provide a written statement.  (*Id.* at 128-30; Conley Dep. at 25.)  Birth states that she told both Gleisberg and Conley everything that happened, but asserts that her dyslexia and emotions about the incident with Myles prevented her from writing everything down. (*Id.* at 93-93, 104.)

After meeting with Birth, Conley and Gleisberg interviewed Myles and other employees who might have information about the incident.  (Conley Dep. at 32; Gleisberg Dep. at 31-34.)  Myles denied that anything inappropriate had occurred. (Myles Dep. at 75-77.)  Myles was sent home pending the conclusion of the investigation, but he ultimately resigned without returning to work.  (*Id.* at 70; Gleisberg Dep. at 41.)  Because Myles resigned, the investigation was terminated.  (Conley Dep. at 41-43.)  Birth claims that Gleisberg instructed her not to go to the police or talk to anyone about what happened with Myles.  (Birth Dep. at 75.)

After Myles's resignation, Birth claims that Myles returned to the store, despite the fact that Gleisberg had promised that Myles would not come into the store.  (*Id.* at 76-77, 79.)  According to Defendants, Myles returned to the store to pick up his personal

belongings and his final paycheck. (Myles Dep. at 73.) Birth also claims she saw Myles parked outside her apartment. (Birth Dep. at 121-22.) Although Conley instructed Birth to call the police after this incident, Birth did not do so. (Conley Dep. at 55; *see also* Gleisberg Dep. at 33 ("I advised her that she should consider contacting the police if she felt uncomfortable.").)

Birth contends that JCP should never have hired Myles because the company knew that he had been accused of sexual harassment in the past. She asserts that another department manager, Natalie Wrobel, told her that JCP was aware of prior incidents of sexual harassment involving Myles at a previous company. (Birth Dep. at 131-32.) She alleges that Wrobel also told her that Gleisberg was aware of Myles's past. (*Id.* at 132). Defendants, on the other hand, claim that Myles never informed anyone at JCP about any previous investigation. (Gleisberg Dep. at 24.) In addition, Myles testified that the investigation found that the complaint against him at his previous employer had no merit. (Myles Dep. at 25-26.)

Birth also points to a prior complaint lodged against Myles for displaying inappropriate posters in his JCP office. (Birth Dep. at 134-36.) According to Gleisberg, the offending poster was a JCP lingerie advertisement, but Myles took it down when Gleisberg told him that employees were uncomfortable with it. (Gleisberg Dep. at 27-28.) Birth also notes that Myles served time for the armed robbery of a female victim in 1978. (Myles Dep. at 34-36.) Finally, Birth asserts that when she reported Myles's assault to Gleisberg, Gleisberg responded, "He did it again." (Birth Dep. at 158.)

In December of 2008, Birth was transferred to a JCP store in Niles, Illinois. (*Id*. at 164.) Birth contends that this transfer was involuntary and that, because of the transfer, she was forced to live out of her car for almost two months. She asserts that she did not receive the health care benefits she was promised at her new job. (*Id*. at 196-97.) Birth alleges that she suffered additional sexual harassment at the new JCP store, including being told by her new boss to wear sexier clothing. (*Id.* at 144-45.) Birth further claims that her new employers questioned her about the sexual assault that had occurred at the Edina location. (*Id.* at 166.) Birth also reported how dissatisfied she had been with how her complaints at the Edina location were handled. (*Id.* at 167-68.)

Birth contends that JCP ultimately terminated her employment in retaliation for these complaints and subsequent complaints about the harassment she suffered at the Niles location. (*Id*. at 189.) Specifically, Birth alleges that in June 2009, JCP manufactured theft charges against her in order to effectuate a wrongful discharge. (*Id*. at 171, 177.) As a result of these charges, Birth was incarcerated for three days. (*Id*. at 15.) Birth also alleges that JCP forced her to sign a written statement admitting to the theft, but she denied the allegations in her statement to the police. (*Id.* at 173-75.) Birth contends that because she has been forced to disclose this allegedly false disciplinary report to potential future employers, she has been unable to find employment after her termination from JCP. (*Id.* at 198-200.)

Defendants now seek summary judgment on all of Birth's claims. Those claims are: Retaliation/Reprisal under the Minnesota Human Rights Act ("MHRA") against JCP (Count I); Negligent Infliction of Emotional Distress against JCP (Count II); Negligent

Retention and Supervision against JCP (Count III); Battery against Myles and JCP (Count IV); Invasion of Privacy against Myles and JCP (Count VI); Assault against Myles and JCP (Count VII); False Imprisonment against Myles and JCP (Count VIII); Defamation against JCP (Count IX); and Intentional Infliction of Emotional Distress against Myles and JCP (Count 10).[1]

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*,

---

[1]     Birth abandoned her claims of premises liability against JCP (Count V). Accordingly, Count V is dismissed.

47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## II.     No Preemption under WCA

Defendants assert that all of Birth's claims except her MHRA retaliation claim should be dismissed because the Minnesota Workers' Compensation Act ("WCA") provides the exclusive remedy for her common law claims and injuries. Defendants contend that this Court lacks jurisdiction because neither the assault exception nor the co-employee exception apply to any alleged intentional torts committed by Myles.

Under Minnesota law, if an employee suffers a personal injury arising out of and in the course of her employment, the WCA provides the exclusive remedy. Minn. Stat. § 176.031 (2008). If an employee's claims fall within the WCA, "the district court is without jurisdiction to proceed further." *McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d 830, 833 (Minn. 1995).

However, the WCA excludes from its coverage injuries "caused by the act of a third person or fellow employee intended to injure the employee because of personal reasons, and not directed against the employee as an employee, or because of the employment." Minn. Stat. § 176.011, subd. 16. This exception is known as the "assault exception." *McGowan*, 527 N.W.2d at 831. In addition, the WCA does not cover injuries that are "intentionally inflicted by [a] co[-]employee," known as the "co-employee exception." Minn. Stat. § 176.061, subd. 5(e); *see also Meintsma v. Loram*

*Maint. of Way, Inc.*, 684 N.W.2d 434, 441 (Minn. 2004) (discussing co-employee exception).

For the assault exception to apply, two requirements must be met: first, the assailant must be "motivated by personal animosity toward his victim"; and second, the injury must "aris[e] from circumstances wholly unconnected with the employment." *McGowan*, 527 N.W.2d at 834 (holding that the assault exception did not apply to the rape of a female director of a homeless shelter because being in isolated places with male clients was both a potential job duty and a "causal factor"); *see also Meintsma*, 684 N.W.2d at 439 (holding that the assault exception did not apply to a birthday spanking administered by co-workers "during working hours in the workplace" because all employees were spanked on their birthdays and the spanking was therefore not personally motivated).

In order for the co-employee exception to apply, the assailant must "consciously and deliberately intend to cause injury, not just intend to do the act." *Meintsma*, 684 N.W.2d at 441. Courts may consider the "nature of the conduct, the implement used, and the reasonable inferences that can be drawn from these factors" in deciding whether the co-employee exception applies. *Id.* (holding that in light of the fact that the employees who administered the spankings were charged with and pled guilty to fifth degree assault, these factors did not preclude the victim's cause of action). Whether an assailant intended to injure his co-worker is "a question for the finder of fact to decide." *Id.*

Defendants contend that because the incident took place during working hours and in the workplace, Birth's claims do not meet the second requirement for the assault

exception. This is a misinterpretation of *McGowan* and *Meintsma*. In *McGowan*, the female shelter director interacted with male clients as part of her job and was often alone with them in isolated places. The rape therefore arose out of her duties as shelter director. Here, Birth's job duties as a selling specialist in the JCP jewelry department did not by necessity entail interacting with a sexually harassing superior. Furthermore, in *Meintsma*, all employees were administered spankings on their birthdays. The spankings were not personally motivated, but rather a ritual activity arising out of the victim's status as an employee. Here, the alleged assault and battery were not directed at all employees, nor did they occur because of Birth's status as an employee.

Because Myles's actions were personally motivated and because the alleged injury did not arise out of Birth's employment activities, the assault exception applies to Birth's claims against Myles, and her tort claims are not preempted by the WCA on this basis.

Defendants also argue that the co-employee exception does not apply to Birth's assault and battery claims because Myles's conduct was motivated by romantic interest and not out of intent to harm Birth. (Defs.' Supp. Mem. at 16.) In order for the co-employee exception to apply, the assailant must "consciously and deliberately intend to cause an injury, not just intend to do the act." *Meintsma*, 684 N.W.2d at 441. Here, Myles is accused of calling Birth into his office, sexually assaulting her, and temporarily preventing her escape. This Court might reasonably draw the inference that Myles's actions were not motivated by "romantic interests." Nevertheless, whether Myles intended to harm Birth is a question for the jury. Taking the facts in the light most

favorable to Birth, the co-employee exception also applies to Birth's assault and battery claims.

In a supplemental letter to the Court, Defendants cite a recent Eighth Circuit case, *Fu v. Owens*, No. 09-2489, 2010 WL 3894192 (8th Cir. Oct. 6, 2010). The Eighth Circuit found the *Fu* plaintiff's case to be "analogous to *McGowan*" because the plaintiff had no contact with her co-employee outside of work, and because the assault took place during working hours while the plaintiff was performing her duties. *Fu*, 2010 WL 3894192 at *3. The court in *Fu* found that the employee physically attacked the plaintiff "for specific, work-related reasons such as . . . reporting [the employee's] allegedly inferior job performance to clinic supervisors." *Id.*

The case at hand is distinguishable from *Fu*. Unlike the plaintiff in *Fu*, Myles did not harass Birth for reasons related to her employment. Rather, his alleged harassment arose out of an apparent desire to be romantically involved with Birth, something unconnected to her status as a co-employee.

Both the assault exception and the co-employee exception apply to Birth's claims against Myles, and those claims are therefore not preempted by the WCA. Thus, the Court will examine each of Birth's claims against Myles in turn.

## III.   Birth's Tort Claims against Myles

### A.    Count IV: Battery

Under Minnesota law, battery is "an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

The two operative elements are intent and offensive contact. *Schumann v. McGinn*, 240 N.W.2d 525, 529 (Minn. 1976).

Taking the facts in the light most favorable to Birth, Birth has established that genuine questions of material fact exist on her battery claim. Birth claims Myles attempted to hug her, pushed her up against a wall, put one hand on her chest and one hand on her arm, and put his knee between her legs. This alleged conduct certainly constitutes intentional, unpermitted offensive contact. Therefore, summary judgment with regard to Birth's claim of battery against Myles is denied.

### B.     Count VII:  Assault

Under Minnesota law, an assault is "an unlawful threat to do bodily harm to another with present ability to carry the threat into effect." *Dahlin v. Fraser*, 288 N.W. 851, 852 (Minn. 1939). "Mere words or threats alone do not constitute assault"; however, "circumstances indicating a present ability to carry out the threats is sufficient to show an assault." *Id.* (internal citations omitted).

The record shows that Birth repeatedly told Myles "no" when he tried to initiate sexual contact. Furthermore, Myles's alleged attempts to restrain Birth indicate an ability to carry out his threats to engage in sexual contact. Once again, taking the facts in the light most favorable to Birth, she has raised genuine issues of fact on her assault claim, and summary judgment is therefore not appropriate.

### C.     Count VI:  Invasion of Privacy/Intrusion upon Seclusion

Defendants assert that Birth's claim of intrusion upon seclusion cannot survive summary judgment because Birth has failed to show that there was an actual intrusion

when Myles waited in his car outside Birth's apartment or came to the store while Birth

was working.  In addition, Defendants contend that Myles is not liable for intrusion upon

seclusion because Birth has not demonstrated that Myles knew he did not have legal or

personal permission to drive near Birth's home or visit the store after his termination.

Defendants misconstrue Birth's claim, however.  Her invasion of privacy claim rests not

on the allegations regarding Myles going to Birth's home or coming back to the store, but

rather she contends that Myles invaded her privacy during the alleged sexual assault.

(Pl.'s Opp'n Mem. at 26.)

In *Lake v. Wal-Mart Stores, Inc.*, the Minnesota Supreme Court recognized the tort

of invasion of privacy and three of the causes of action associated with it:  intrusion upon

seclusion, appropriation, and publication of private facts.  582 N.W.2d 231, 235 (Minn.

1998).  Intrusion upon seclusion occurs when one "'intentionally intrudes, physically or

otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . .

if the intrusion would be highly offensive to a reasonable person.'"  *Id.* at 233 (quoting

Restatement (Second) of Torts § 652B (1977)).  "In the context of intrusion upon

seclusion, questions about 'the reasonable person standard are ordinarily questions of

fact . . . but they become questions of law if reasonable persons can draw only one

conclusion from the evidence.'"  *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741,

745 (Minn. Ct. App. 2001) (quoting *Hougum v. Valley Mem'l Homes*, 574 N.W.2d 812,

818 (N.D. 1998)).

A claim of intrusion-upon-seclusion requires:  (1) an intrusion, (2) that is highly

offensive, and (3) into some matter in which a person has a legitimate expectation of

privacy. *Swarthout*, 632 N.W.2d at 744. To establish Myles's liability for this cause of action, Birth must demonstrate that Myles's intrusion was substantial, was of a kind that would be highly offensive to a reasonable person, and was a result of conduct to which a reasonable person would strongly object. *Id.* at 745.

Birth argues that Myles intruded on her seclusion when he shoved his knee into her groin area while trying to kiss her. Birth has established that questions of material fact exist on her intrusion-upon-seclusion claim. Whether Myles's actions during the alleged sexual assault constitute highly offensive conduct to which a reasonable person would strongly object is a question of fact. Therefore, summary judgment on Birth's intrusion upon seclusion claim against Myles is denied.

### D.    Count VIII:  False Imprisonment

Defendants request dismissal of Birth's claim against Myles for false imprisonment because Birth entered and left Myles's office voluntarily, and because there is no evidence that Myles intended to confine Birth. Defendants argue that, "[i]n the employment context, '[s]ubmitting to the verbal direction of an employer, unaccompanied by force or threats, does not constitute false imprisonment.'" (Defs.' Supp. Mem. at 27 (quoting *Bellini v. Univ. of St. Thomas*, No. C6-94-367, 1994 WL 425166, at *5 (Minn. Ct. App. Aug. 16, 1994)).)

Under Minnesota law, a claim for false imprisonment requires a showing of "(1) words or acts intended to confine, (2) actual confinement, and (3) awareness by the plaintiff that [s]he is confined." *Blaz v. Molin Concrete Prods. Co.*, 244 N.W.2d 277, 279 (Minn. 1976) (citations omitted). Taking the facts in the light most favorable to

Birth, it is difficult to characterize Myles's alleged conduct as "verbal direction of an employer, unaccompanied by force or threats."  Birth admits that she entered Myles's office voluntarily, but only because she believed Myles wanted to discuss her work attendance.  Birth testified, however, that when she attempted to leave Myles's office, he not only blocked the door but continued to restrain her with sexual advances.  Furthermore, Defendants concede that Myles may have momentarily stood between Birth and the door and tried to grab her arm.  (Defs.' Supp. Mem. at 27.)

Because questions of material fact exist as to whether Myles's acts were intended to confine her, whether she was actually confined, or whether she was aware of this confinement, summary judgment with regard to Birth's false imprisonment claim against Myles is denied.

### E.    Counts II and X:  Emotional Distress

Defendants also move for summary judgment on Birth's claim against Myles for intentional infliction of emotional distress ("IIED") and her claim for negligent infliction of emotional distress against JCP.

Under Minnesota law, a person claiming IIED must establish four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe.  *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 438-39 (Minn. 1983) (citing Restatement (Second) of Torts § 46(1) (1965)).  As a general rule, "compensatory damages for mental distress are only available if the emotional injury is accompanied by a contemporaneous physical injury."  *Id.* at 438.

Accepting Birth's allegations about the alleged sexual assault as true, Birth has not provided evidence of severe emotional injury or that she suffered a physical manifestation of emotional distress. Birth did not seek medical or mental health care until after she filed this lawsuit. In addition, Birth concedes that this medical treatment was for conditions unrelated to the sexual assault.

Birth's claim of IIED fails because she has not presented evidence of severe emotional injury. For the same reasons, her claim against JCP for negligent infliction of emotional distress also fails. *See Stadler v. Cross*, 295 N.W.2d 552, 553 (Minn. 1980) (A person may recover for negligent infliction of emotional distress when that person is "within the zone of danger of physical impact[,] [] reasonably fears for his or her own safety, and [] *consequently suffers severe emotional distress with resultant physical injury* . . . .") (emphasis added). Summary judgment is granted on Counts II and X.

## IV. Birth's Claims against JCP

### A. JCP is not Vicariously Liable for Myles's Intentional Torts

Defendants argue that JCP may not be held vicariously liable for any intentional torts committed by Myles because his alleged misconduct was not foreseeable or reasonably related to his employment duties.

Under the doctrine of *respondeat superior*, an employer is vicariously liable for the intentional torts of an employee "within the course and scope of employment." *Ismil v. L.H. Sowles Co.*, 203 N.W.2d 354, 357 (1972). "[A]n employee's act need not be committed in furtherance of his employer's business to fall within the scope of his employment." *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999).

Rather, the employee's acts must be "foreseeable, related to and connected with acts otherwise within the scope of employment." *Frieler v. Carlson Mktg. Group*, 751 N.W.2d 558, 583 (Minn. 2008) (quoting *Fahrendorff*, 597 N.W.2d at 910) (internal quotation marks omitted). To survive summary judgment in favor of the employer, "a plaintiff must present some evidence that an employee's sexual misconduct was foreseeable." *Id.*

Birth contends that sexual harassment is in general a foreseeable risk in the workplace. She argues that JCP was put on notice of Myles's propensity to commit harm because of the complaints about the lingerie posters, the investigation of Myles at his previous place of employment, and the prior armed robbery. In addition, Birth points to Gleisberg's alleged statement that Myles "did it again" as evidence of foreseeability of the alleged attack.

The record indicates, however, that the complaints about the lingerie posters were not sexual harassment complaints, and that until Myles's deposition, JCP had no prior knowledge of any investigation of Myles for sexual harassment at his previous place of employment. Given that Myles's robbery conviction occurred more than 30 years ago, for conduct when Myles was 18 years old, this conviction could not have given JCP any reason to suspect that Myles would engage in the sexual assault of a female employee.

Furthermore, even if this Court accepts Birth's testimony that Gleisberg told Birth that Myles "did it again," Birth admits that Gleisberg did not go into detail about what the statement meant. This statement simply does not constitute an admission that JCP knew that Myles posed any sort of imminent danger.

Birth has not established that Myles's misconduct was foreseeable. Therefore, JCP may not be vicariously liable for any intentional torts he may have committed. Summary judgment with regard to JCP's liability for Counts IV, VI-VIII, and X is granted.

### B.        Negligent Retention and Supervision

For similar reasons, Birth's claims of negligent retention and supervision also fail to survive summary judgment. Under Minnesota law,

> [l]iability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others.

*Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 911 (Minn. 1983). In other words, "[t]o find negligent retention, the court must find that the employer knew or should have known of the employee's negative activities." *Kresko v. Rulli*, 432 N.W.2d 764, 769 (Minn. Ct. App. 1988).

There is no evidence in the record demonstrating that JCP knew or should have known that Myles posed a threat of injury to others. Therefore, summary judgment on Count III is granted.

### C.        Retaliation/Reprisal under the Minnesota Human Rights Act

Birth raises three claims of retaliatory action by JCP: the involuntary transfer to Illinois, JCP's failure to provide promised medical benefits after the transfer, and termination from the Illinois store due to allegedly false theft charges. Defendants argue that Birth has failed to demonstrate a *prima facie* claim of retaliation and reprisal, and to

the extent that Birth's claims rest on conduct that occurred solely in Illinois, argue that the claims are not legally cognizable under the MHRA. (Defs.' Reply Memo. at 9, n.3.)

When there is an issue of what state's substantive law to apply, this Court follows the choice-of-law rules applied by Minnesota courts. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). However, because there is no conflict between the substantive law of Illinois and that of Minnesota, the Court need not undertake a formal choice-of-law analysis.[2] *See Prudential Ins. Co. of Am. v. Kamrath,* 475 F.3d 920, 924 (8th Cir. 2007) ("Before applying [Minnesota's] choice-of-law rules, however, a trial court must first determine whether a conflict exists.").

The MHRA prohibits intentional reprisal against an employee who has engaged in statutorily protected activity, such as filing a discrimination complaint. Minn. Stat. § 363A.15. In construing the MHRA, this Court applies law developed in cases arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17 (1994). *See Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn. 1983); *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-102 (Minn. 1999). The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green,* 411 U.S.

---

[2]     The requirements for establishing a *prima facie* case of retaliation under the IHRA are no different from those under the MHRA. *See Carter Coal Co. v. Human Rights Comm'n*, 633 N.E.2d 202, 207 (Ill. App. Ct. 1994) ("To establish a *prima facie* case of retaliation under the Act, a plaintiff employee must show that (1) he or she engaged in a protected activity; (2) the employer committed an adverse act against him or her; and (3) a causal nexus existed between the protected activity and the adverse act."). Under Illinois law, the causal nexus between the protected activity and the adverse act "does not require the plaintiff to have engaged in a protected activity which directly affected the retaliating entity," and a cause of action may be established where an employee has previously filed a charge of discrimination against a former employer. *Id.*

792 (1973), applies to the analysis of Birth's retaliation claim. *Wells v. SCI Mgmt., L.P.,* 469 F.3d 697, 700 (8th Cir. 2006).

Under the *McDonnell Douglas* framework, in order to establish a *prima facie* claim of retaliation, Birth must demonstrate that (1) she engaged in statutorily protected conduct, (2) JCP took adverse employment action against her, and (3) a causal connection exists between the two. *Wells,* 469 F.3d at 702. If Birth establishes a *prima facie* case, the burden of production shifts to JCP to show a legitimate, nondiscriminatory reason for its action. Birth must then establish that the proffered nondiscriminatory reason was a mere pretext for unlawful discrimination.

The parties agree that Birth's complaint against Myles constitutes a statutorily protected action for the purposes of the MHRA. However, Birth has failed to satisfy the second and third elements of her case, because the employment action was not adverse and it was not causally connected to her complaint against Myles.

"Unpalatable transfers . . . are generally not actionable." *Spencer v. Dep't of Corr.,* No. A07-0462, 2008 WL 668259, at *4 (Minn. Ct. App. Mar. 11, 2008). A transfer, even to another city, involving no reduction of pay or benefits does not constitute an adverse employment action. *LePique v. Hove*, 217 F.3d 1012, 1013-14 (8th Cir. 2000) (internal citations omitted); *Montandon v. Farmland Indus.*, 116 F.3d 355, 359 (8th Cir. 1997) (holding that "[h]owever unpalatable," when the transfer "[does] not entail a change in position, title, salary, or any other aspect of [] employment" it "[does] not rise to the level of an adverse employment action."). While the timing of Birth's transfer to Illinois may be questionable, there is a question of fact as to whether the

transfer was voluntary or not. (*See* Gleisberg Dep. at 45-47 (stating that Birth requested the transfer because her boyfriend was moving to Chicago).) However, because Birth's transfer did not result in a reduction of her pay or benefits or a change in her title or position, it is not an adverse employment action as a matter of law.

Birth has also failed to establish that the actions of her Illinois employer are causally connected to her complaint against Myles in Minnesota. Under the JCP healthcare policy, eligibility for benefits is determined by the number of hours an employee has worked with the company. Birth was not previously receiving medical benefits from JCP and has not offered any evidence that she had logged the requisite number of hours to qualify for those benefits.

Nor can Birth demonstrate that her arrest constituted retaliation. Although arresting an employee merely for giving unauthorized discounts on merchandise seems excessive, JCP has provided evidence on the record showing that Birth received several policy violation warnings for this conduct and that she provided a written statement admitting to the conduct. That JCP concocted this elaborate scheme as pretext for retaliatory termination requires more than mere allegations, and Birth has offered only that.

Because Birth has not met the requirements for a *prima facie* retaliation and reprisal claim under either the MHRA or IHRA, summary judgment on Count I is granted.

**D.     Defamation**

Finally, Defendants seek summary judgment on Birth's defamation claim.  Under Minnesota law, to establish a *prima facie* claim of defamation a plaintiff must demonstrate that the statement made was false, was communicated to a third party, and tended to harm the plaintiff's reputation.  *Bol v. Cole,* 561 N.W.2d 143, 146 (Minn. 1997).  Furthermore, false accusations of criminal activity are defamatory *per se.  See Becker v. Alloy Hardfacing & Eng'g Co.,* 401 N.W.2d 655, 661 (Minn. 1987).[3]

However, a true statement cannot be defamatory.  *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn. 1980).  In addition, "statements made in the course of an employer's investigation into employee misconduct are protected by [a] qualified privilege."  *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 923 (Minn. 2009).

Defendants argue that JCP's statements to Birth's potential employers regarding the reason for Birth's termination do not constitute defamation.  The fact that Birth was arrested is true, as well as the fact that she was discharged due to evidence that she had violated store policy.  In light of these facts, this Court finds that Birth has not established that self-publication of her arrest and reason for termination constitutes defamation.

---

[3]     Given that the alleged defamation occurred solely within Illinois, the Court notes that the requirements for a *prima facie* claim of defamation are the same under Illinois law.  *See Solaia Technology, LLC v. Specialty Publ'g Co.,* 852 N.E.2d 825, 839 (Ill. 2006) (requiring a plaintiff to show that the defendant (1) made a false statement about the plaintiff, (2) to a third party, and (3) the defendant damaged the plaintiff by making the statement); *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996) (stating that a remark that imputes the commission of a crime is *per se* defamatory).

# CONCLUSION

For the foregoing reasons, the Court grants Defendants' summary judgment motion with regard to Counts I-III, IX, and X. In addition, because JCP cannot be liable for the intentional torts allegedly committed by Myles, the Court dismisses JCP from Counts IV, VI, and VII. The Court denies Defendants' motion as to Myles's liability for Counts IV, VI, and VII.

Though Birth's claims against Myles survive today, prevailing at the summary judgment stage is not tantamount to prevailing at trial, and Birth must still prove her allegations to a jury. The Court suggests that it may be in the best interests of the parties to negotiate a resolution of this dispute prior to trial. As the parties are aware, Magistrate Judge Mayeron is available to assist in settlement negotiations should the parties find such services to be helpful.

Therefore, **IT IS HEREBY ORDERED** that:

1. Defendants JCP and Myles's Motion for Summary Judgment (Doc. No. [11]) is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a. Defendants' Motion is **GRANTED** as to Count I-III, IX and X of Plaintiff's Complaint (Doc. No. [1], Attachment 1) and to Counts IV, VI, VII, and VIII with regard to JCP's liability.

22

b.    Defendants' Motion is **DENIED** as to Counts IV, VI, VII,

and VIII with regard to Myles's liability.


Dated:  December 6, 2010                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge